**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PENNY VETETOE,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **No. 3:13-00008** |
| | ) | **Judge Nixon/Brown** |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

**To: The Honorable Judge John T. Nixon, Senior United States District Judge**

<u>**REPORT AND RECOMMENDATION**</u>

For the reasons explained herein, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record (the record) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

The plaintiff protectively filed for Supplemental Security Income (SSI) on July 08, 2009 (DE 10, p. 111).[1] She initially claimed an onset date of October 07, 1994 (DE 10, p. 99) and disability due to the following: hepatitis C, a dislocated left hip, liver disease, left arm problems, arthritis, neck pain, asthma, bronchitis, and memory loss (DE 10, p. 116). On November 12, 2009, the Commissioner denied the SSI claim (DE 10, p. 57). On November 16, 2009, the plaintiff timely filed for reconsideration (DE 10, p. 63). On January 27, 2010, the Commissioner again denied the SSI claim (DE 10, p. 65).

---

1 Page numbers referring to the record herein reflect the Bates Stamp.

On March 02, 2010, the plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) (DE 10, p. 68). On August 09, 2011, the plaintiff appeared before the ALJ, Ronald E. Miller (DE 10, pp. 25-51). Also appearing were Dr. Pedro Roman, the vocational expert (VE) (DE 10, p. 25), and the plaintiff's attorney, Ms. Benson. During the hearing, the plaintiff amended her alleged onset date from October 07, 1994 to July 08, 2009 (DE 10, p. 32). On September 06, 2011, the ALJ decided that the plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act (the Act) (DE 10, p. 20). On November 03, 2011, the plaintiff timely requested that an Appeals Council (AC) review the decision (DE 10, pp. 7-8). On November 21, 2012, an AC denied the request (DE 10, pp. 1-6).

On January 04, 2013, the plaintiff timely brought the instant action (DE 1) and filed a motion to proceed in forma pauperis (DE 2). On January 15, 2013, the Court granted the plaintiff's motion (DE 3). On March 29, 2013, the defendant filed the answer and the record (DE 9-10). On May 30, 2013, the plaintiff filed the motion for judgment on the record and memorandum in support of the motion (DE 14; 14-1) pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Social Security Administration (SSA), through its Commissioner, as set out by the ALJ.  On June 25, 2013, the defendant filed a response in opposition (DE 15). On July 09, 2013, the plaintiff filed a motion for leave to file a reply and the reply (DE 16; 16-1). Pursuant to the Court's previous order on April 01, 2013, granting the plaintiff 14 days after service of the defendant's response in which to file a reply brief (DE 11), the plaintiff's reply was timely.

The matter is now properly before the Court.

## II.    Review of the Record

### A.    Relevant Medical Evidence

Relevant medical evidence consists of the plaintiff's "complete medical history," meaning "at least the 12 months preceding the month in which [the plaintiff] file[s] [their] application unless there is a reason to believe that development of an earlier period is necessary or unless [the plaintiff] say[s] that [their] disability began less than 12 months before [they] filed.…" 20 C.F.R. § 416.912(d). It is the responsibility of the SSA to develop the record and "make every reasonable effort to help [the plaintiff] get medical reports…." 20 C.F.R. § 416.912(d). However, it is the responsibility of the plaintiff to "provide medical evidence showing that [they] have an impairment and how severe it is during the time [they] say that [they] are disabled." 20 C.F.R. § 416.912(c).

Here, the plaintiff filed her application on July 08, 2009 and later amended her onset date to that filing date (DE 10, pp. 32; 99; 111). The plaintiff initially alleged that her onset date was October 07, 1994 and that she became unable to work on this date due to a "car wreck" (DE 10, p. 116). Therefore, the ALJ had some reason to believe that the plaintiff's alleged disability began earlier than the 12 months preceding her filing date, rendering earlier medical evidence pertaining to the car accident relevant. Yet, the earliest medical evidence that the plaintiff provided dates to 2005, 11 years after the reportedly disabling car accident (DE 10, pp. 179-222).

On May 31, 2005, the plaintiff was taken to Trousdale Medical Center (Trousdale) Emergency Room (ER) and admitted to Centennial Medical Center, where she was treated for "a drug overdose, signs of gastrointestinal bleeding, and respiratory failure." (DE 10, pp. 179-95).

On July 06, 2005, the plaintiff presented to University Medical Center (UMC) ER to request medication for pain and anxiety (DE 10, pp. 196-207). She reported hip pain since a car

accident and anxiety. Her medical history included cirrhosis, gastrointestinal bleed, hepatitis C, hip dislocation, and smoking 1 pack per day (PPD) (DE 10, p. 198). She was diagnosed with arthralgia (joint pain) and chronic pain syndrome, and discharged as stable (DE 10, p. 199).

On July 07, 2005, the plaintiff was taken to Trousdale ER and later admitted to the psychiatric unit at UMC for being "confused, paranoid, and delusional." (DE 10, p. 211). Her medical history included back pain, hepatitis C, gastrointestinal bleeding, bronchial asthma, head injury and loss of consciousness after a car accident, and left forearm injury (DE 10, pp. 211; 214). She was diagnosed with non-specific psychosis and mood disorder, treated with medication, and discharged as improved (DE 10, pp. 216-17).

On July 29, 2009, the plaintiff presented to Trousdale ER with chest congestion for the previous 5 months and hip pain (DE 10, pp. 280-92). She reported that she smoked 1.5 PPD (DE 10, p. 281). She reported "trouble breathing at night" and that she usually has inhalers and pain medication but was "out of all of her medications."  (DE 10, P. 285). She was diagnosed with chronic bronchitis, chronic obstructive pulmonary disease (COPD), tobacco abuse, and chronic left hip pain (DE 10, P. 286). The plaintiff was prescribed antibiotics, medication to treat her breathing, and pain medication (DE 10, p. 286). She recalled having her inhalers at home but reported that she had not been using them (DE 10, p. 286). She was instructed to follow up with her primary care physician for management of her pain, chronic bronchitis, congestion, and tobacco abuse, and stated "that she realize[d] that she needs to stop smoking." (DE 10, p. 287).

On August 29, 2009, the plaintiff presented to Trousdale ER and was treated for a gluteal cyst (DE 10, pp. 267-79; 272). She reported that she had not smoked in 12 days (DE 10, p. 272). During her treatment, tests revealed that she had a Methicillin-resistant Staphylococcus aureus

(MRSA) infection (DE 10, p. 278). She was informed of this on September 01, 2009 and instructed to follow up with her primary care physician for antibiotics (DE 10, p. 278).

On November 11, 2009, the plaintiff presented to Dr. William Lyles (Dr. Lyles) for liver tests (DE 10, pp. 297-301). She reported a smoking history of 1 PPD for 33 years, and a history of asthma and hepatitis C (DE 10, pp. 297-98).

On November 12, 2009, the plaintiff presented to Trousdale with fatigue (DE 10, pp. 261-65). Her history of hepatitis C was documented and tests were conducted, although the record does not indicate any treatment (DE 10, pp. 261-65).

On February 18, 2010, the plaintiff presented to Dr. Lyles with chest pain (DE 10, pp. 342-43). She was assessed with chronic pain syndrome, left shoulder pain, anxiety, asthma, and chest wall pain (DE 10, p. 343). "In house" treatment was planned and the plaintiff was informed to call for refills when she needed them (DE 10, p. 343).

On March 11, 2010, the plaintiff presented to Trousdale ER with respiratory problems (DE 10, pp. 314-24). She was diagnosed with bronchitis and discharged with appropriate medications and instructions, including the instruction of "no smoking." (DE 10, p. 321).

On December 12, 2009, March 22, April 22, October 19, November 19, and December 15, 2010, as well as January 14, February 15, and March 15, 2011, the plaintiff presented to Dr. Lyles for medication refills and was assessed with either chronic pain syndrome or chronic pain syndrome and COPD (DE 10, pp. 325-39). The plaintiff's medical history of asthma, hepatitis C, and psychological issues were also noted (DE 10, pp. 325-39).

## B.    Consultative Examiner Assessments

On September 09, 2009, Dr. Roy Johnson (Dr. Johnson) performed a medical consultative examination on behalf of Disability Determination Services (DDS). (DE 10, pp.

223-26). During the examination, the plaintiff reported that she was in a car accident in 2008,[2] in which she was "hit by a truck and dislocated [her] left hip." (DE 10, p. 224). The plaintiff reported a history of liver disease, hepatitis C, cirrhosis, arthritis, a broken scapula, surgery to her left arm, difficulty lifting with her left arm, a hospitalization for a stomach aneurysm, decreased memory after a head injury, asthma, COPD, shortness of breath, and chest pain (DE 10, p. 224). She reported smoking for 34 years at an average of 2 PPD, and reported that she quit smoking three weeks previously (DE 10. P. 224). Dr. Johnson assessed that the plaintiff "may occasionally lift 15 pounds…has no sitting restrictions…may stand and walk for 6 hours with normal breaks out of 8 [hours]…should continue to see her doctor…and her work activity should not exceed any restrictions placed on her by her treating physician." (DE 10, p. 226).

On September 16, 2009, Dr. Linda Blazina (Dr. Blazina) performed a mental status examination on behalf of DDS (DE 10, pp. 227-31). Dr. Blazina's diagnostic impression was that the plaintiff has depressive disorder, anxiety disorder, and personality disorder (DE 10, p. 230). Dr. Blazina reported that "the [plaintiff's] ability to understand and remember short and simple instructions is not considered to be impaired. [Her] ability [to] understand and remember complex detailed instructions may be mildly impaired due to possible cognitive issues and…history of head injury with difficult[y] remembering daily activities." (DE 10, p. 231). Dr. Blazina reported that the plaintiff had "some difficulty with her ability to recall new information" and mild impairment of her concentration and attention "due to anxiety." (DE 10, p. 231). Dr. Blazina reported that the plaintiff's "social interaction abilities do not appear to be impaired. Her ability to adapt to changes in a work routine and tolerate workplace stress is likely mildly impaired due to her anxiety and depression." (DE 10, p. 231).

---

2 The Court notes the discrepancy between this reported date of 2008 and the reported date of 1994 throughout the record (DE 10, p. 99; 116; 268). There appears to be no contention about the date, however.

On November 05, 2009, Dr. George W. Livingston (Dr. Livingston) completed a Psychiatric Review and Residual Functional Capacity (RFC) assessment (DE 10, pp. 233-50). He noted that the "[medical evidence] suggests the [plaintiff] has a mental impairment involving dep[ression], anx[iety], and [personality] disorder that is more than non-severe but that does not meet or equal any listing." (DE 10, p. 245). He reported that the plaintiff had moderate restrictions in activities of daily living and moderate difficulties in social functioning, concentration, persistence, and pace (DE 10, p. 243). He found that the plaintiff "could perform 1 to 3 step tasks with normal supervision" and that her "social functioning and adaptation should be adequate" for doing so (DE 10, p. 249). On January 24, 2010, Dr. Rudy Warren (Dr. Warren) affirmed this assessment (DE 10, p. 303).

On November 10, 2009, Dr. John T. Netterville (Dr. Netterville) completed a physical RFC assessment (DE 10, p. 251-59). He reported that the plaintiff had no exertional, postural, manipulative, or communicative limitations (DE 10, pp. 252-55). He reported that the plaintiff had a visual limitation for far acuity and an environmental limitation of needing to avoid concentrated exposure to "fumes odors, dusts, gasses, poor ventilation, etc. [because of] wheezing/asthma." (DE 10, pp. 254-55). He noted that "taking [the plaintiff's] RFC is lowered to gross vision and avoid concentrated fumes." (DE 10, p. 258). On January 27, 2010, Dr. Frank Pennington (Dr. Pennington) affirmed this assessment (DE 10, p. 302).

### C. Testimonial Evidence

### 1. Plaintiff and Witness Testimony

On August 09, 2011, the plaintiff appeared before the ALJ by telephone (DE 10, pp. 27-51). Prior to testifying, the plaintiff asked the ALJ, "Can you hear me?" (DE 10, p. 27). The ALJ responded that he could hear the plaintiff "just fine" and instructed her to "keep [her] mouth

close to the telephone." (DE 10, p. 27). The plaintiff then proceeded to testify on direct examination by the ALJ. The plaintiff testified that she had finished the seventh grade and that she lived by herself (DE 10, p. 28). She testified that she smokes "almost six cigarettes a day." (DE 10, p. 31). The ALJ asked her to repeat how many cigarettes she smokes and the plaintiff testified again that she smokes "about six cigarettes a day," adding that "I can't hardly smoke…I can't breathe good." (DE 10, p. 31). The plaintiff testified that she occasionally drinks alcohol but does not take any drugs other than those prescribed to her (DE 10, p. 31).

The ALJ asked the plaintiff when she last worked and the plaintiff testified, "[I]t's probably been 10 years since I had my car wreck." (DE 10, p. 32). She testified that her last job was at Jake's Factory Food Company and that she "worked there four years, and then they closed it down." (DE 10, p. 32). The ALJ clarified that the plaintiff last worked about 10 years ago and that the job ended when "[t]hey shut down the factory." (DE 10, p. 33). The plaintiff testified that she gets along with co-workers and the public (DE 10, p. 33).

The plaintiff testified that she has no income (DE 10, p. 33). She testified that her major problem is COPD, and explained that she goes to her doctor for a breathing treatment and cannot afford her own breathing machine (DE 10, pp. 34; 39). She testified that she sees Dr. Lyles for her rheumatoid arthritis once a month, and stated, "If I had insurance, or I could afford it, then he would give me this other kind of medication." (DE 10, pp. 34-37).

The ALJ asked the plaintiff whether she had any other problems that prevented her from working (DE 10, p. 37). The plaintiff testified that she had "memory loss" after a car accident (DE 10, p. 37). The plaintiff testified that during the accident, the bones in her left arm were crushed, requiring metal instrumentation and preventing her from lifting more than 15 pounds (DE 10, pp. 37-38).

Next, the plaintiff testified on direct examination by Ms. Benson (DE 10, pp. 38-43). She testified that her shoulders were hurt during the car accident and that she predominantly uses her right arm due to her left arm injury (DE 10, p. 38). The plaintiff testified again that she was unable to afford her own breathing machine and testified that her physician indicated she would need an oxygen tank by age 60 (DE 10, p. 39). She testified that she had been diagnosed with MRSA and hepatitis C, and that she has not received treatment for the hepatitis C because she was told "it's looking good." (DE 10, p. 40). She testified that she can walk or stand for 5 minutes before needing to sit, and she can sit for 5 minutes before needing to move (DE 10, p. 41). She testified that she is unable to lift with her left arm and that she might be able to lift 30 or 40 pounds with her right arm (DE 10, pp. 41-42). She testified that she goes to the grocery store once a week with assistance (DE 10, pp. 42-43). She testified that she mostly microwaves her meals, does some household chores, and "[has] to sit down and take breaks." (DE 10, p. 43).

At six times during hearing, the ALJ reminded the plaintiff to answer the question asked "and not some other question." (DE 10, pp. 31-32; 34). The ALJ instructed the plaintiff to answer the question, "then just stop and let me ask you another question." (DE 10, pp. 35-36). The ALJ asked the plaintiff whether she was on a cellular phone, stating "[t]here's a delay and you're breaking up." (DE 10, p. 37). The ALJ asked the plaintiff to repeat her statements regarding her memory loss, "because [he] didn't get all of it," and her need for an oxygen tank, and the plaintiff complied both times (DE 10, pp. 37; 39).

## 2. Vocational Expert Testimony

The ALJ called the VE to testify and indicated that the plaintiff had "no past relevant work." (DE 10, p. 45). The ALJ presented the VE with a hypothetical scenario, considering the following hypothetical person:

[T]he same age, education, and work experience as [the plaintiff]. This individual would have no exertional limitations, however, the individual…should have no exposure to marked changed in temperature and humidity, no exposure to dust, fumes, odors, or gasses. The individual would be able to perform 1 to 3 step tasks with normal supervision. Social function would have to be adequate for those tasks.

(DE 10, p. 45). The VE testified that the plaintiff could perform other work, including light,[3] un-skilled (SVP of 2)[4] work as a cashier, with 22,014 employed in Tennessee and 1,096,686 employed nationally in this job (DE 10, pp. 45-46). The VE testified that the plaintiff could perform light work as a general clerk, "borderline between skilled and un-skilled," with 10,016 employed in Tennessee at the semi-skilled level and 3,895 employed at the un-skilled level, and with 572,940 employed nationally at the semi-skilled level and 222,810 employed at the un-skilled level in this job (DE 10, pp. 46-47). The VE testified that the plaintiff could perform light, unskilled work as a finisher, with 3,143 employed in Tennessee and 124,889 employed nationally in this job (DE 10, pp. 47-48). The VE testified that these jobs would not be available if the hypothetical person was unable to work a full 8 hour day (DE 10, p. 48).

Ms. Benson asked the VE how the plaintiff's testimony, if the ALJ found it credible, would affect the job market (DE 10, p. 49). The VE testified that "there would be no work in the local…or national economy." (DE 10, p. 49).

### III.      Analysis

### A.      Standard of Review

The issue before the Court, pursuant to 42 U.S.C. § 1383(c)(3), is limited to whether there is substantial evidence in the record as a whole to support the Commissioner's findings of

---

3 20 C.F.R. § 416.967 ("To determine the physical exertion requirements of work in the national economy, [jobs are classified] as **sedentary, light, medium, heavy, and very heavy**.") (emphasis added).

4 SSR 00-4P, 2000 WL 1898704 ("The Dictionary of Occupational Titles (DOT) lists a **specific vocational preparation (SVP)** time for each described occupation. Using the skill level definitions in 20 C.F.R. § 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.") (emphasis added).

fact. "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 434 (6th Cir. 2010) (quoting *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994)). The Court "may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Carrelli*, 390 F. App'x at 434. If there is "substantial evidence" in the record that supports the Commissioner's decision and the Commissioner applied the correct legal standard, then the Court must affirm the Commissioner's final decision, "even if the Court would decide the matter differently, and even if substantial evidence also supports the [plaintiff's] position." *Id.* (citing *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc)).

### B.     Administrative Proceedings

Disability is defined for Title XVI SSI claims as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. § 1382(c)(a)(3)(A); 20 C.F.R. § 416.905. The ALJ uses a five-step sequential evaluation for SSI claims to determine whether the plaintiff meets this definition of "disabled." 20 C.F.R. § 416.920(a)(4)(i)-(v).

    i.    If the plaintiff is engaged in substantial gainful activity, the Court will find that the plaintiff is not disabled.

    ii.    If the plaintiff *does not* have a severe medically determinable physical or mental impairment meeting the duration requirement or a combination of such impairments, the Court will find that the plaintiff is not disabled.

    iii.    If the plaintiff *does* have an impairment(s) that meets or equals one of the listings of impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1 (Appendix 1) and meets the duration requirement, the Court will find that the plaintiff is disabled.

iv.   The court considers the plaintiff's RFC and past relevant work. If the plaintiff can still perform their past relevant work, the Court will find that they are not disabled.

v.   The Court considers the plaintiff's RFC, age, education, and experience to determine if the plaintiff can perform work *other than* past relevant work. If the plaintiff can make an adjustment, the Court will find that they are not disabled.

20 C.F.R. § 416.920(a)(4)(i)-(v). The plaintiff has the burden of proof at steps one to four. *Carrelli*, 390 F. App'x at 435. The burden shifts to the Commissioner at step five, where the Commissioner must "identify a significant number of jobs in the economy that accommodate the [plaintiff's] RFC and vocational profile." *Id.* At step five, the ALJ may use the medical-vocational guidelines in 20 C.F.R. pt. 404, Subpt. P, App. 2 (Appendix 2). 20 C.F.R. § 416.969. Appendix 2, referred to as "the grid," provides guidance to the ALJ in determining whether a plaintiff is disabled or whether significant numbers of other jobs exist for the plaintiff. *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). "Where the findings of fact made with respect to [an] individual's vocational factors and RFC coincide with all of the criteria of a particular rule [in the grid], the rule directs a conclusion as to whether the individual is or is not disabled." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (quoting Appendix 2 at § 200.00(a)). Otherwise, instead of using the grid alone, the ALJ must consider all relevant facts. 20 C.F.R. § 416.969.

### C.   Administrative Reliance on Vocational Expert Testimony

If a plaintiff's limitations "do not satisfy the exact requirements of the medical-vocational guidelines, the ALJ [is] entitled to rely on the testimony of a VE in reaching his decision" as to whether the plaintiff is disabled or whether the plaintiff is not disabled and a significant number of jobs exist that the plaintiff can perform. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004). If an "issue in determining whether [a plaintiff] is disabled is whether [their] work

skills can be used in other work and the specific occupations in which they can be used…, [the ALJ] may use the services of a VE….” 20 C.F.R. § 4016.966(e).

What number of jobs in the national economy constitutes a “significant number” of jobs is a determination that must be made on a case-by-case basis. *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (citing *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988)). The ALJ may consider “the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.” *Id.*

### D.    Notice of Decision

On September 06, 2011, the ALJ denied the plaintiff's claims and made the findings of fact and conclusions of law enumerated below.

1. Claimant has not engaged in substantial gainful activity since July 8, 2009, the application date.

2. Claimant has the following combination of severe impairments:  asthma and depressive disorder. Although she has a history of hepatitis C, it is not shown to cause any limitations and is considered to be a non severe impairment.

3. Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1.

4. Claimant has the RFC to perform a full range of work at all exertional levels. She should avoid pulmonary irritants and exposure to marked changes in temperature and humidity. She is able to perform simple and low level detailed tasks with normal supervision.

5. Claimant has no past relevant work.

6. Claimant was 47 years old, which is defined as a younger individual age 18-49, on the date the application was protectively filed.

7. Claimant has a limited 8th grade education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. Claimant has not been under a disability, as defined in the Act, since July 8, 2009, the date the application was protectively filed.

(DE 10, pp. 14-20). On September 06, 2011, the ALJ made the specific decision below.

1. Based on the application for SSI protectively filed on July 8, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Act [42 U.S.C. § 1382(c)(a)(3)(A)].

(DE 10, p. 20).

## IV.     Claims of Error

### A.     The ALJ erred by failing to properly consider all of the plaintiff's impairments and by failing to provide sufficient reasons for not finding these impairments to be severe.

The plaintiff argues that the ALJ failed to consider all of the plaintiff's impairments, including: (1) chronic bilateral hip pain; (2) arthralgia; (3) chronic pain syndrome; (4) MRSA; (5) abdominal aneurism; (6) cirrhosis; (7) anxiety; (8) psychosis; (9) NOS; (10) COPD; (11) chest wall pain; and (12) hepatitis C (DE 14-1, p. 6).

The ALJ determines whether a plaintiff's impairment or combination of impairments is severe at the second step of the disability determination. 20 C.F.R. § 416.920(a)(4)(ii). A plaintiff's impairment(s) must be severe or the determination ends unfavorably for the plaintiff at the second step. 20 C.F.R. § 416.920(c). The plaintiff has the burden of proving that they have a severe impairment, and of proving so with medical evidence. 20 C.F.R. § 416.912(c). The ALJ has the burden of reviewing all evidence received. 20 C.F.R. § 416.927(b).

The ALJ will find that "[a]n impairment or combination of impairments is ***not severe***" if it does not significantly limit [the plaintiff's] physical or mental ability to do basic work activities."

20 C.F.R. § 416.921(a) (emphasis added). "Basic work activities" means "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b).[5] "In this circuit, the [plaintiff's] burden of proof at step two 'has been construed as a *de minimis* hurdle in the disability determination process…[A]n impairment can be considered *not* severe only if it is a slight abnormality that *minimally* affects work ability regardless of age, education, and experience.'" *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 774 (6th Cir. 2008) (citing *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988) (emphasis added)).

Evidence of an impairment means "medical evidence showing that [the plaintiff has] an impairment(s) and how severe it is during the time [they] say that [they] are disabled. [The plaintiff] must provide evidence…showing how [their] impairment(s) affects [their] functioning during the time [they] say that [they] are disabled…." 20 C.F.R. § 416.912(c). The plaintiff's impairment(s) "must be established by medical evidence consisting of signs, symptoms, and laboratory findings,[6] not only by [the plaintiff's] statement of symptoms." 20 C.F.R. § 416.908.

---

5 20 C.F.R. § 416.921(b). Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include:
(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

6 20 C.F.R. § 416.928. Signs, Symptoms, and Laboratory Findings.
(a) Symptoms are your own description of your physical or mental impairment. If you are a child under age 18 and are unable to adequately describe your symptom(s), we will accept as a statement of this symptom(s) the description given by the person who is most familiar with you, such as a parent, other relative, or guardian. Your statements (or those of another person) alone, however, are not enough to establish that there is a physical or mental impairment.
(b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.
(c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests.

Ultimately, a severe impairment is a "threshold" requirement that the plaintiff must meet. *Bowen v. Yuckert*, 482 U.S. 137, 147 (1987). "[T]he severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 863.

While certain evidence is required to establish a severe impairment, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 416.927(c). A medical opinion may be from a treating or non-treating source, as well as from an examining or non-examining source. 20 C.F.R. § 416.927(c). The impairment at issue may be a "medically determinable ***physical*** or ***mental*** impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 416.927(c) (citing 20 C.F.R. § 416.905) (emphasis added).

When the ALJ evaluates a medical opinion, "[i]f the ALJ rejects a treating physician's opinion, he or she must provide a basis for this rejection." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009) (citing *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir.1987))**.** A "treating physician" is a plaintiff's "own physician, psychologist, or other acceptable medical source who provides…or has provided…medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. An "ongoing treatment relationship" is a relationship for which:

> the medical evidence establishes that [the plaintiff] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s). [An ALJ] may consider an acceptable medical source who has treated or evaluated [a plaintiff] only a few times or only after long intervals…to be [the] treating source if the nature and frequency of the treatment or evaluation is typical for [the] condition(s)."

20 C.F.R. § 416.902.

When the ALJ evaluates a medical opinion pertaining to a mental impairment, "the regulations require the ALJ to follow a 'special technique' to assess the severity of the impairment." 20 C.F.R. § 416.920a. The special technique requires the ALJ to evaluate, specify, rate, and record. 20 C.F.R. § 416.920a(b)(1)-(2). First, the ALJ must evaluate the plaintiff's "symptoms, signs, and laboratory findings to determine whether [the plaintiff] has a medically determinable mental impairment(s)." 20 C.F.R. § 416.920a(b)(1). Next, if a medically determinable mental impairment is found, the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)…." 20 C.F.R. § 416.920a(b)(1). Then, the ALJ must rate the degree of functional limitation in (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 416.920(c)(3). Finally, the ALJ must record the findings in his decision, and must include the "significant history…examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 416.920a(e)(4).

While the ALJ must evaluate every medical opinion received, they might not cite every opinion. If the ALJ chooses not to cite or rejects the opinion of a non-treating physician in their decision, they need not provide a basis for the rejection as they must for the rejection of a treating physician's opinion. 20 C.F.R. § 416.927(c)(2). Yet, "[i]t is well established that judicial review of the Secretary's findings must be based upon the record taken as a whole." *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989) (citing *Shelman,* 821 F.2d at 320; *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir.1984); *Beavers v. Secretary of Health, Education & Welfare,* 577 F.2d 383, 387 (6th Cir.1978)). "Thus, it is clear that both [the Court of Appeals] and the district court may look to any evidence in the record regardless of whether it

has been cited...." *Walker*, 884 F.2d at 245; (See also *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x, 534, 538 (6th Cir. 2014) ("We may look to portions of the record that the ALJ did not discuss or cite....")). "There is a distinction between the court's supplanting its own rationale for that of the agency, which is impermissible, and the court's using additional record evidence to bolster the agency's rationale, which is permissible." *Calvin v. Astrue*, 3:05-0109, 2010 WL 55452, *14 (M.D. Tenn. Jan. 7, 2010) aff'd sub nom. *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370 (6th Cir. 2011). Again, this Court's standard of review requires affirmation of the ALJ's decision if there is "substantial evidence" to support it.[7]

The record shows that the ALJ did not err at the second step, but instead weighed all of the evidence in determining impairment severity. The ALJ found that the plaintiff "has the following combination of severe impairments: asthma and depressive disorder." (DE 10, p. 14). The record provides the following evidence to support the ALJ's determination regarding the severity of the plaintiff's other purported impairments:

(1) Chronic bilateral hip pain is in the record once during the plaintiff's July 06, 2005 visit to UMC for pain and anxiety (DE 10, pp. 197). Throughout the record, left hip pain, not bilateral pain, is recorded (DE 10, pp. 41, 56, 67; 116; 226; 258; 285-86). Likewise, (2) arthralgia," or "joint pain" is in the record once during the same visit (DE 10, pp. 198; 199; 205; 206). There is no evidence to suggest that the ALJ ignored this evidence, although he had no burden to cite it because it concerns a non-treating physician, and no "ongoing treatment relationship." 20 C.F.R. § 416.902. Dr. John Butcher (Dr. Butcher) evaluated the plaintiff on this one date, and the plaintiff never returned to UMC but instead established care with Dr. Lyles for pain, albeit 5 years later (DE 10, pp. 196-207; 325-39). Still, this Court reviews the record as a

---

7 *See Supra* Part III.A.

whole, inclusive of non-treating sources. Similarly, (3) Chronic pain syndrome was documented as early as May 2005 (DE 10, p. 188) and then consistently by Dr. Lyles (DE 10, pp. 293-301; 325-43). The ALJ noted this (DE 10, p. 17). However, the only restriction related to pain is Dr. Johnson's assessment that the plaintiff could "occasionally lift 15 pounds…and may stand and walk for 6 hours…out of 8." (DE 10, p. 226). The ALJ gave this assessment "little weight" because it was "inconsistent with his examination and the record as a whole….." (DE 10, p. 17). Even with this restriction, the record provides substantial evidence to support the ALJ finding that these impairments would do no more than minimally affect work. There is no evidence in the record to suggest that these impairments would limit the plaintiff's "ability to do basic work activities." 20 C.F.R. § 416.921(a). As the ALJ wrote, "[t]he evidence does not substantiate a basis for an intensity, severity, and frequency of a level of pain that would significantly interfere with work-related activities." (DE 10, p. 18). Therefore, there is substantial evidence to support the ALJ's determination that the plaintiff's bilateral hip pain, arthralgia, and chronic pain were not severe.

(4) MRSA is in the record once during the plaintiff's August 29, 2009 visit to Trousdale ER, where she was treated for a gluteal cyst (DE 10, pp. 267-79; 272). Nothing in the definition of a treating physician indicates that ER physicians can unequivocally never be treating physicians. However, Dr. Philip Hunt (Dr. Hunt) evaluated the plaintiff in the ER and instructed the plaintiff to follow up with her primary care physician for antibiotics (DE 10, p. 278). Dr. Hunt had evaluated the plaintiff previously in July 2009, but for unrelated complaints (DE 10, p. 285). Therefore, Dr. Hunt was a non-treating physician with no ongoing treatment relationship and the ALJ had no burden to cite this evidence. 20 C.F.R. § 416.902. Nonetheless, the ALJ did cite the plaintiff's diagnosis with MRSA (DE 10, p. 16). However, there is nothing in the record to show how the plaintiff's MRSA "affects [her] functioning." 20 C.F.R. § 416.912(c). Therefore, there is substantial evidence to support the ALJ's determination.

(5) Abdominal aneurysm. During the plaintiff's September 09, 2009 consultative examination with Dr. Johnson, the plaintiff reported that an aneurysm occurred 18 months prior to the visit (DE 10, p. 258). In a separate disability report, the plaintiff reported "stomach problems" that occurred in 2005 (DE 10, pp. 118-19). In 2005, during an ER admission, Dr. Wallace McGrew (Dr. McGrew) treated the plaintiff for "signs of gastrointestinal bleeding." (DE 10, pp. 179-95). Examination revealed "no [abnormally dilated veins], no bleeding and no ulcers." (DE 10, p. 189). Again, the ALJ had no burden to cite either record because Dr. Johnson is a non-treating consultative examiner and because Dr. McGrew had no "ongoing treatment relationship" with the plaintiff. 20 C.F.R. § 416.902. Moreover, there is nothing in the record that actually documents an aneurysm, either in 2005 or 18 months prior to the September 2009 visit. Therefore, there is substantial evidence to support the ALJ's determination.

(6) Cirrhosis is documented as part the plaintiff's history on July 29 and August 29, 2009, and March 11 and May 06, 2010 when the plaintiff presented to Trousdale ER for unrelated problems as well as in the examinations by Dr. Johnson and Dr. Blazina (DE 10, pp. 224; 230; 268; 281; 305; 315). Again, the ALJ had no duty to cite records of consultative examiners or ER physicians without an ongoing relationship but did cite these visits and noted that "[t]here is no evidence of medical treatment for…liver disease." (DE 10, pp. 16-18). There is also no evidence as to how the plaintiff's history of cirrhosis "affects [her] functioning." 20 C.F.R. § 416.912(c). Therefore, there is substantial evidence to support the ALJ's determination.

(7) Anxiety disorder was documented in September 2009, when Dr. Blazina found that the plaintiff had depressive disorder, anxiety disorder, and personality disorder (DE 10, p. 230). Dr. Blazina listed mild limitations related to anxiety and depression (DE 10, p. 231). In November 2009, Dr. Livingston reviewed the record and found that it "suggests the [plaintiff]

has a mental impairment involving dep[ression], anx[iety], and [personality] disorder that is more than non-severe but that does not meet or equal any listing." (DE 10, p. 245). He listed moderate functional limitations related to these mental impairments (DE 10, p. 243). Dr. Blazina and Dr. Livingston documented the plaintiff's depressive disorder when they documented the plaintiff's anxiety disorder and the mild to moderate limitations attributed to these impairments.

The record shows that the ALJ followed the required 'special technique' to assess the severity of the plaintiff's mental impairment. He evaluated the plaintiff's records from Dr. Blazina and Dr. Livingston, and he specified the findings therein to substantiate the plaintiff's depressive disorder, anxiety disorder, and personality disorder (DE 10, pp. 17-18). The ALJ then reiterated the degree of functional limitations that each provider found, recording the basis for his conclusion about the severity of the plaintiff's mental impairments (DE 10, pp. 17-18). As the ALJ documented:

> Dr. Blazina indicated the [plaintiff's] ability to understand and remember short and simple instructions and socially interact were not impaired and the ability to understand and remember complex and detailed instructions, maintain attention and concentration, adapt to changes in a work routine, and tolerate workplace stress were mildly impaired…[Dr. Livingston]…concluded the [plaintiff] had a moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of extended decompensation in a work or work-like setting. More specifically, he concluded the [plaintiff] could perform 1 to 3 step tasks with normal supervision and [was] able to interact socially and adapt.

(DE 10, pp. 17-18). The record shows that the ALJ considered these functional limitations "in reaching a conclusion about the severity of the mental impairments" as required under 20 C.F.R. § 416.920a(e)(4). The ALJ concluded that the plaintiff suffers from a severe mental impairment of depression alone (DE 10, p. 14). As the ALJ concluded:

> [The plaintiff] ambulates independently, lives alone and cares for herself, goes grocery shopping, socializes with friends and family, talks on the telephone, and frequently goes to the library for DVDs to watch on television. [The plaintiff] also testified her last job

ended due to plant closure and not due to inability to perform her job or inability to get along with others.

(DE 10, p. 18). Therefore, there is substantial evidence to support the ALJ's determination that the plaintiff's anxiety was not a severe mental impairment.

(8) Regarding psychosis, the plaintiff was diagnosed with psychosis during a July 07, 2005 visit to Trousdale ER (DE 10, p. 212). However, the record does not provide any evidence that a provider identified limitations related to psychosis or any evidence as to how the plaintiff's psychosis "affects [her] functioning." 20 C.F.R. § 416.912(c). Therefore, there is substantial evidence to support the ALJ's determination.

(9) NOS is an acronym for "not otherwise specified" and is not a diagnosis or an impairment (DE 10, pp. 17; 230).

(10) COPD is in the record during the plaintiff's July 29, 2009 visit to Trousdale ER for, inter-alia, chest congestion (DE 10, pp. 279-92). Dr. Hunt documented that the patient has "Albuterol and Advair at home but has not been using these." (DE 10, p. 286). His physical exam revealed "diminished breath sounds…no significant wheezes, rales, or rhonchi." (DE 10, p. 286). In September 2009, consultative examiner Dr. Johnson noted the plaintiff's report that she has COPD (DE 10, p. 224). In his medical assessment, he listed no limitations or restrictions related to COPD (DE 10, p. 226). In November 2009, Dr. Netterville noted, "[t]here is…reference to COPD in the medical records but no documentation and no respiratory distress…[the plaintiff] is noted to have a history of asthma…." (DE 10, p. 258). Dr. Netterville reviewed the record and indicated that the plaintiff should avoid "fumes, odors, dusts, gasses, poor ventilation, etc. [because of] wheezing/asthma." (DE 10, p. 255). Throughout 2009 to 2011, Dr. Lyles assessed that the plaintiff had COPD as well as asthma (DE 10, pp. 325-39; 328;

334; 336). His physical exam once revealed "wheezes" and once revealed that something related to the respiratory system was "diminished." (DE 10, pp. 332; 334).

The ALJ noted the medical evidence in his decision, citing the visit to Trousdale ER, the plaintiff's multiple visits to Dr. Lyles, and the medical assessments of Dr. Johnson and Dr. Netterville (DE 10, pp. 16-17). Despite Dr. Hunt's and Dr. Lyles' diagnoses, neither physician provided any medical evidence of restrictions associated with COPD. The only restriction related to breathing was Dr. Netterville's assessment that the plaintiff should avoid ""fumes, odors, dusts, gasses, poor ventilation, etc.," but this was explicitly mentioned because of "wheezing/asthma," not COPD (DE 10, p. 255). Asthma and COPD are not synonymous. Rather, COPD[8] is a disease that may be characterized by, inter-alia, the specific impairment of asthma. Had the ALJ found COPD to be a severe impairment, essentially because the plaintiff has limitations related to asthma, substantial evidence would have supported this interpretation of the record. However, substantial evidence likewise supports the ALJ's determination that COPD was not a severe impairment because the record does not provide any evidence that a provider identified limitations related to COPD or identified how the plaintiff's COPD "affects [her] functioning," as providers did for the plaintiff's asthma. Therefore, there is substantial evidence to support the ALJ's determination. Under this Court's standard of review, if substantial evidence supports the ALJ's determination, the Court will affirm that determination "even if substantial evidence also supports the [plaintiff's] position." *Carrelli*, 390 F. App'x at 434 (citing *Mullen,* 800 F.2d at 545 (en banc)).

(11) Chest wall pain is in the record during the plaintiff's visit to Dr. Lyles on February 18, 2010, when the plaintiff reported "hard breathing…, like someone hit her in the chest." (DE

---

8 Dorland's Illustrated Medical Dictionary 530 (Elsevier 2012) (1900) (Chronic obstructive pulmonary disease (COPD): "any disorder characterized by persistent or recurring obstruction of bronchial air flow, such as chronic bronchitis, asthma, or pulmonary emphysema.").

10, p. 342). The ALJ noted this evidence in his decision (DE 10, p. 16). Even taking this evidence to show that the plaintiff had chest wall pain, and it affects her functioning by causing difficulty breathing, a severe impairment of chest wall pain is not "established by medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 416.908.   The only evidence from the visit was a note that something related to the respiratory system was "diminished." (DE 10, p. 343). This note and the complaint of chest wall pain were absent from the plaintiff's visit one month later (DE 10, pp. 340). Therefore, there is substantial evidence to support the ALJ's determination.

(12) The plaintiff's history of hepatitis C is documented throughout the record (DE 10, pp. 211; 217; 220; 224; 230; 258). However, evidence as to how it "affects [the plaintiff's] functioning" is absent. The plaintiff testified that she has had no treatment for hepatitis C and that "[t]hey said it's looking good." (DE 10, p. 40). Therefore, there is substantial evidence to support the ALJ's determination.

The record provides substantial evidence that the ALJ did not err in his severity determination. The record provides substantial evidence to support the ALJ's determination that the plaintiff failed to meet the de minimus showing of severity for the claims herein. As the ALJ summarized:

> Given the claimant's allegations of totally disabling symptoms, one would expect to see some indication in the treatment records of restrictions placed on the [plaintiff] by a treating physician. Yet, a review of the record in this case reveals no restrictions recommended by a treating physician. The evidence of record simply does not support the [plaintiff's] allegations of disability."

(DE 10, pp. 18-19).

The record also provides substantial evidence that the ALJ appropriately gave his reasoning, as explained above.

**B.** **The ALJ erred by finding that the plaintiff's COPD was not a severe impairment.**

The plaintiff argues that the ALJ: (1) "failed to thoroughly evaluate [the] records;" (2) failed to provide "'good reasons' for finding [the plaintiff's] diagnosis of COPD to not be severe;" (3) erroneously found that "there was little in the way of treatment for COPD;" (4) made his determination because the plaintiff continued to smoke cigarettes, and (5) failed to consider the plaintiff's lack of insurance (DE 14-1, pp. 7-8).

The plaintiff's first two arguments, that the ALJ failed to evaluate the record and that the ALJ failed to provide sufficient reasoning, are addressed at length above.[9]

The plaintiff next argues that the ALJ "stated that the [p]laintiff did not receive sufficient treatment for [COPD]" and based his determination off of this erroneous finding (DE 14-1, p. 7). As evidence of this, the plaintiff cites the ALJ's statement, "[a]lthough there is evidence the [plaintiff] has asthma and uses inhalers, she has not required emergency room visits, hospitalizations, breathing machine, or supplemental oxygen and continues to smoke cigarettes." (DE 14, p. 7). The record shows that the ALJ was not, with this sentence, making a statement about the insufficiency of the plaintiff's treatment for COPD. The record shows that the ALJ was making a statement about the insufficiency of evidence of limitations or restrictions. The ALJ went on to state that he could find "no restrictions recommended by a treating physician" and that "[t]he evidence of record simply does not support the [plaintiff's] allegations of disability." (DE 10, p. 18). The Court does not read into this statement an implication that the ALJ believed the plaintiff needed to seek some other treatment.

The plaintiff is correct that this statement by the ALJ is inaccurate. The plaintiff had been to Trousdale ER for chest congestion and she had testified that her physician wanted her on a

---

9 *See Supra* Part IV.A. (10).

"breathing machine." (DE 10, pp. 31; 285). The inaccuracy is not in the record itself. Nor is the inaccuracy between the record and the determination of the ALJ. Instead, the inaccuracy is in the ALJ's written decision. First, the ALJ documented the ER visit and reiterated the plaintiff's testimony about her history of COPD (DE 10, pp. 16-17). Yet, he later wrote that the plaintiff had not been to the ER or required a breathing machine (DE 10, p. 18). The ALJ could have been more consistent and accurate in his synopsis of the record here. However, the record shows that the ALJ was explicit in his reasoning. Although the plaintiff had visited the ER and had required breathing machine treatments, there was no evidence of restrictions related to COPD. As the ALJ stated, "[g]iven the claimant's allegations of totally disabling symptoms, one would expect to see some indication in the treatment records of restrictions placed on the claimant by a treating physician. Yet, a review of the record in this case reveals no restrictions recommended by a treating physician." (DE 10, p. 18)

Finally, the plaintiff argues that the ALJ made his disability determination because the plaintiff smokes cigarettes and that the ALJ failed to consider the plaintiff's lack of insurance (DE 14-1, p. 8). The plaintiff argues that the ALJ may have relied on 20 C.F.R. § 416.930 without stating so (DE 14-1, p. 8).

Under 20 C.F.R. § 416.930, "if [a plaintiff does not] follow the prescribed treatment without a good reason, [the ALJ] will not find [them] disabled…." 20 C.F.R. § 416.930(b). As the *Dailey* Court discussed in the context of an ALJ's credibility analysis, "[i]t is a well-established rule that in order to receive benefits, the [plaintiff] must follow treatment prescribed by his doctor if this treatment can restore his ability to work. Upon failure to follow the prescribed treatment, benefit payments may be stopped, or…[the failure may be] taken into consideration in not awarding benefits." *Dailey v. Colvin*, 2:11-0098, 2013 WL 1775152, *16

(M.D. Tenn. Apr. 25, 2013) report and recommendation adopted, 2:11-CV-0098, 2013 WL 2155568 (M.D. Tenn. May 17, 2013) (emphasis added).

The record shows that the plaintiff's physicians had informed her of the need to stop smoking (DE 10, pp. 287; 321). As explained above, the record also shows that those physicians had not documented restrictions associated with COPD that would enable the ALJ to determine that COPD was a severe impairment. Therefore, the ALJ may have considered the plaintiff's continued smoking to determine that the plaintiff's COPD was not as severe as she claimed. However, the record shows that the plaintiff's smoking was not the dispositive factor in the severity determination. Neither was the plaintiff's failure to obtain a breathing machine due to lack of insurance. Instead, the record shows that the lack of evidence of restrictions related to COPD supported the ALJ in finding that COPD was not a severe impairment.

Therefore, the record provides substantial evidence that the ALJ made his determination regarding COPD after considering the record, and explained his reasoning. The record provides substantial evidence that the determination was not based on insufficient treatment, on the plaintiff's continued smoking, or despite the fact that the plaintiff lacks insurance. Instead, the determination was based on insufficient evidence to suggest restrictions associated with COPD.

C.      The recording of the hearing was inaudible during some of the testimony.

The plaintiff argues that the hearing transcript contains numerous notations indicating that the hearing was inaudible during some of the testimony (DE 14-1, pp. 8-9).

A procedural deficiency such as an inaudible recording of a hearing may constitute good cause for a remand. "The joint conference committee of Congress in reporting on Social Security Disability Amendments of 1980 to the Social Security Act indicated that in some cases, procedural difficulties, such as an inaudible hearing tape or a lost file, necessitate a request for

remand." *Hart v. Colvin*, 4:14CV-00009-HBB, 2014 WL 2993802, *2 (W.D. Ky. July 3, 2014).

The committee stated as follows:

> The conferees have been informed that there are sometimes procedural difficulties which prevent the [Commissioner] from providing the court with a transcript of administrative proceedings. Such a situation is an example of what could be considered "good cause" for remand. Where, for example, the tape recording of the claimant's oral hearing is lost or inaudible, or cannot otherwise be transcribed, or where the claimant's files cannot be located or are incomplete, good cause would exist to remand the claim to the [Commissioner] for appropriate action to produce a record which the courts may review under 205(g) of the act. It is the hope of the conferees that remands on the basis of these breakdowns in the administrative process should be kept to a minimum so that persons appealing their decision are not unduly burdened by the resulting delay. H.R.Conf.Rep. No. 944, 96th Cong., 2d Sess. 59 (1980), *reprinted in 1980 U.S.C. C.A.N.* 1277, 1392, 1407.

*Hart*, 4:14CV-00009-HBB, *2 (citing *Cofer v. Astrue,* 2009 WL 580340, *1 (E.D.Ca.2009)).

Simply, a plaintiff is unable to "challenge an unfavorable decision by the Appeals Council if a transcript of the hearing is unavailable for him to review…[and the Court] is also unable to conduct a [thorough] review of the case, under 205(g) of the Social Security Act, without a transcript of the hearing." *Hart*, 4:14CV-00009-HBB, *3.

The record shows, first, that the plaintiff was able to challenge the AC decision without raising this argument (DE 10, pp. 171-74). Further, the record shows that the recording of the hearing does not reflect inaudible portions that would warrant a remand because this Court is able to conduct a thorough review of the record.

There were six instances of inaudible testimony (DE 10, pp. 30; 35; 38; 42; 48). First, the plaintiff responded to a question from the ALJ about how many packs of cigarettes she smoked per day (DE 10, p. 30). She responded "I don't smoke many, but that's [INAUDIBLE]." (DE 10, p. 30). The ALJ repeated his question regarding how many packs per day the plaintiff smoked and she answered (DE 10, p. 31). Next, the ALJ and plaintiff appear to have been speaking at the same time during the following exchange:

Q All right, listen. All right, just a minute.
A [INAUDIBLE]
Q All right. I'm interested in admitting –
A [INAUDIBLE]
Q Okay, ma'am. Listen, let me ask you a question and then you answer. When you answer it, if you'll stop talking, I can ask you another question, okay?
A Yes, sir. I'm sorry.

(DE 10, p. 35). After this exchange, the ALJ continued with questioning the plaintiff without any other instances of inaudible testimony during his questioning (DE 10, pp. 35-38). The next inaudible portions of the hearing were during the plaintiff's questioning by Ms. Benson (DE 10, p. 38). The plaintiff stated in response to questions about use of her arm, "I guess, ma'am. Say I broke my [INAUDIBLE], which is behind my neck, in the car wreck, and it hurt" and, "I'm sorry. With my bad arm, I can't lift a [INAUDIBLE] pound. With my good arm, I'm not sure, maybe 30, 40 pounds. If I can, I'm not sure I can even do that." (DE 10, pp. 38; 42). Finally, the ALJ presented a hypothetical to the VE, stating, "Okay. All right. Now, let's assume that I find that hypothetical candidate from [INAUDIBLE] would be unable to work a full eight hours a day. Would these jobs be available?" (DE 10, p. 48). The VE was able to answer (DE 10, p. 48).

Therefore, the record provides substantial evidence that the inaudible testimony does not preclude this Court from conducting a thorough review and remand is not required.

**D.    The credibility of the plaintiff's statements was not properly evaluated.**

The plaintiff argues that the ALJ violated Social Security Ruling (SSR) 96-7P because he "did not specifically state whether he found the [plaintiff's] testimony credible or not…, nor did he specifically state the amount of weight he assigned to that testimony." (DE 14-1, pp. 14-15).

Pursuant to SSR 96-7P and 20 C.F.R. § 416.929(c), an ALJ uses a 2 part test to evaluate the plaintiff's symptoms and considers 7 factors to determine the plaintiff's credibility regarding those symptoms. First, the ALJ "consider[s] whether there is an underlying medically

determinable physical or mental impairment…that could reasonably be expected to produce the individual's…symptoms." SSR 96-7P, 1996 WL 374186. Next, "the [ALJ] evaluate[s] the intensity, persistence, and limiting effects of the…symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7P, 1996 WL 374186. A plaintiff's symptoms will limit their ability to do basic work activities to the extent that the symptoms can reasonably be accepted as consistent with objective medical evidence. SSR 96-7P, 1996 WL 374186. However, when objective evidence does not reflect the severity of symptoms, the ALJ requires other evidence to determine the credibility of a plaintiff's statements about their symptoms. SSR 96-7P, 1996 WL 374186. In those cases, the ALJ must consider 7 factors: (1) daily activities; (2) location, duration, frequency, and intensity; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment; (6) measures to relieve pain or other symptoms; and (7) functional limitations and restrictions. 20 C.F.R. § 416.929(c). When the record shows that an "ALJ [has] considered the evidence in the record and provided specific reasons for [their] credibility findings, [their] decision is entitled to great deference and *is supported by substantial evidence*." *Anthony v. Astrue*, 266 F. App'x 451, 460 (6th Cir. 2008) (emphasis added).

The record shows that the ALJ did not violate SSR 96-7P by failing to state whether he found the plaintiff's testimony credible or by failing to state the amount of weight he assigned to it. Instead, the ALJ explicitly stated that "[a]fter careful consideration of the evidence…the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (DE 10, p. 16).

Further, the record shows that the ALJ properly evaluated the plaintiff's symptoms and credibility. The record shows that the ALJ first found that the plaintiff had the severe impairments of asthma and depressive disorder, and that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (DE 10, p. 15). Next, the ALJ evaluated the "mild objective medical findings" regarding the intensity, persistence, and limiting effects of the plaintiff's symptoms, including the plaintiff's consistent visits to Dr. Lyles, her ER visits, and the consultative examinations (DE 10, pp. 16-19). Finally, the record shows that the ALJ considered the 20 C.F.R. § 416.929(c) factors and found a lack of credibility, as explained below (DE 10, p. 15).

The ALJ considered the plaintiff's (1) daily activities, stating that the plaintiff "uses the microwave and performs some household chores with frequent breaks," and "ambulates independently, lives alone and cares for herself, goes grocery shopping, socializes with friends and family, talks on the telephone, and frequently goes to the library…." (DE 10, p. 18).

The ALJ considered the (2) location, duration, frequency, and intensity of the plaintiff's symptoms. He stated that the plaintiff had been treated for, inter-alia, "chronic left hip pain," "chest congestion," and "chest pain." (DE 10, p. 16). He documented the plaintiff's testimony that she had experienced memory loss since a car accident "ten years ago." (DE 10, p. 18).

The ALJ considered (3) precipitating and aggravating factors. He documented that the plaintiff experienced "difficulty breathing at night" when she had "Albuterol and Advair inhalers at her home but she ha[d] not been using them." (DE 10, p. 16).

The ALJ considered the (4) type, dosage, effectiveness, and side effects of medication. He documented her medications, including Lortab, Albuterol, Advair, antibiotics, Advinza, Xanax, Soma, and Robitussin (DE 10, p. 16). He documented that "[t]he record does not show

any side effects from prescribed medication that caused significant limitations of function that lasted for a period of 12 months. Rather, the evidence demonstrates she received good results from medications when taken as prescribed on a consistent basis." (DE 10, p. 18).

The ALJ considered the plaintiff's (5) treatment. He documented that providers instructed her to "take medications as prescribed." (DE 10, p. 16). He stated that although the plaintiff had been diagnosed with hepatitis C ten years ago, she had not had "any treatment in the past several years because she was told laboratory test results were looking good." (DE 10, p. 18). He documented that the plaintiff "was previously given a referral to a heart doctor and did not go" although she indicated in 2010 that she believed she needed to (DE 10, p. 16). He documented that the plaintiff "also reported no current mental health treatment" to Dr. Blazina (DE 10, p. 17).

The ALJ considered (6) measures to relieve pain or other symptoms. He documented that "Dr. Lyles' records reflects he renewed her medications every month from October 19, 2010 through March 15, 2011." (DE 10, p. 17). He also noted that "Dr. Lyles stopped narcotics prescriptions and informed [the plaintiff] that she [was] to call back for refills when it [was] time to do so." (DE 10, p. 16).

The ALJ considered the plaintiff's (7) functional limitations and restrictions. He documented the findings of Dr. Blazina, that the plaintiff's "ability to understand and remember short and simple instructions and socially interact were not impaired and the ability to understand and remember complex and detailed instructions, maintain attention and concentration, adapt to changes in a work routine, and tolerate workplace stress were mildly impaired." (DE 10, pp. 17-18). He documented the findings of Dr. Livingston, that the plaintiff "had a moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of

extended decompensation in a work or work-like setting." (DE 10, p. 18). He documented that Dr. Livingston found that the plaintiff "could perform 1 to 3 step tasks with normal supervision and [was] able to interact socially and adapt." (DE 10, p. 18).

Therefore, the record provides substantial evidence that the ALJ did not violate SSR 96-7P and that the ALJ properly evaluated the plaintiff's symptoms and credibility.

## V. Conclusion

There is substantial evidence within the record to support the Commissioner's findings of fact and the Commissioner applied the correct legal standard.

## VI. Recommendation

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion (DE 14) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days, after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140 *reh'g denied*, 474 U.S 1111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).


**ENTERED** this _____ day of July, 2014.

s/Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge